**In The United States District Court**
**For The Eastern District of Arkansas**

ANIMAL LEGAL DEFENSE FUND;
ANIMAL EQUALITY; CENTER FOR
BIOLOGICAL DIVERSITY; and FOOD
CHAIN WORKERS ALLIANCE

    *Plaintiffs*,

    v.

JONATHAN and DeANN VAUGHT, doing
business as Prayer Creek Farm, and PECO
FOODS, INC.

    *Defendants*.

Case No.: 4:19-CV-442-JM

**PLAINTIFFS'
CONSOLIDATED
OPPOSITION TO
DEFENDANTS' MOTIONS
TO DISMISS**

Plaintiffs are prepared to engage in First Amendment protected activities that would subject them to liability at the hands of Defendants. They ask this Court to declare that liability unconstitutional and enjoin Defendants from utilizing the law against them. This is standard practice in First Amendment litigation. Pre-enforcement challenges prevent plaintiffs from having to choose "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [they] believe[] to be constitutionally protected activity." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974); *see also St. Paul Area Chamber of Commerce v. Gaertner,* 439 F.3d 481, 488 (8th Cir. 2006) (pre-enforcement litigation also "promotes good public policy of breeding respect for the law.").

Indeed, the "Arkansas Ag-Gag Law" at issue, Ark. Code § 16-118-113, was passed to protect "'farmers'" (including Defendants) from people "'tak[ing] pictures or record[ing] things'" to expose acts of animal "'cruel[ty]'" (engaging in speech), Complaint, Dkt. No. 1 ¶¶ 101-02 (quoting House floor statement); the exact work of Plaintiffs Animal Legal Defense

Fund ("ALDF") and Animal Equality ("AE"), *see, e.g.*, *id.* ¶ 9. The Ag-Gag Law is thus part of a

nationwide series of statutes—promoted by the same lobbyists that worked in Arkansas and with

similar text—with the admitted purpose of preventing animal advocacy groups from speaking

against factory farms. *Id.* ¶¶ 4, 19-27. These statutes have been uniformly held unconstitutional

in pre-enforcement cases. *Id.* ¶ 21 (citing cases).

The only unique feature of the Arkansas Law is its penalties are "'enforced through a

private right of action.'" *Id.* ¶ 28 (quoting floor statement by Law's sponsor). The Law

authorizes owners and operators of commercial enterprises to seek liquidated damages "for each

day, or portion of a day" the statute is violated. Ark. Code § 16-118-113(e)(4). The legislature

explained it was crafted in this manner to evade judicial review and thereby "'protect this

legislation'" from an expected "'constitutional challenge,'" as the Law's aim is to chill speech.

*Id.* ¶ 28 (quoting floor statement by Law's sponsor). In fact, after watching groups open the

courthouse doors to challenge the North Carolina statute on which the Arkansas Law is

"'modeled,'" *id.* ¶ 27 (quoting statement to House Judiciary Committee by Law's sponsor)—

through alleging they wished to investigate the University of North Carolina ("UNC") but feared

the law's penalties, *People for the Ethical Treatment of Animals, Inc. [PETA], v. Stein*, 737 Fed.

Appx. 122 (4th Cir. 2018) (unpublished)—Arkansas barred state agencies and universities from

enforcing its Ag-Gag Law, Ark. Code § 16-118-113(g).

Lest there be any doubt that the Law warrants First Amendment scrutiny, it also operates

by restricting classic First Amendment freedoms. The Law prohibits making "record[ings]" of

misconduct and/or gathering information to "use[]," *i.e.*, communicate. *See, e.g.*, Ark. Code

§ 16-118-113(c)(1)-(3). The testimony in support of the Law accurately explains its covered

conduct mirrors the techniques of "'activist employment'" used by organizations like ALDF and

AE to access closed facilities and gain information for their advocacy. Complaint ¶¶ 58-59, 63-64, 98. The reports and media such investigations have produced—by ALDF, AE, Plaintiff Center for Biological Diversity ("CBD"), and Plaintiff Food Chain Workers Alliance ("FCWA"), among others—have evinced industrial agriculture's health and safety violations, environmental and food contamination, and criminal animal cruelty. *Id.* ¶ 10. Independent analysis shows these exposés alter the marketplace of ideas. *See, e.g.*, *id.* ¶ 11.

Providing a case-or-controversy through which this Court can consider the Law's constitutionality, the Law has succeeded in suppressing Plaintiffs' speech. ALDF and AE have identified Arkansas factory farms and slaughterhouses they wish to investigate through "activist employment"—the industrial slaughter facilities run by Defendant Peco Foods, Inc. ("Peco") and the confined hog operation run by Defendants Jonathan and DeAnn Vaught (the "Vaughts"). *See, e.g.*, *id.* ¶ 65. Contrary to Defendants' assertion that they were "random[ly]" selected, Peco Br., Dkt. No. 19, at 10, Plaintiffs' research establishes these facilities are both likely to be engaged in animal cruelty that Plaintiffs wish to expose, *see, e.g.*, ¶¶ 67-68, 70-71, *and also* that the ways they are structured ensure investigating these operations will provide important information on the risks factory farming pose to workers and the environment, *see, e.g.*, *id.* ¶¶ 16, 67, 70-72. ALDF and AE have gone so far as to "retain[] an experienced investigator who is ready, willing and able to conduct employment-based investigations of these facilities" in the precise manner restricted by the Ag-Gag Law, and they are prepared to move forward. *Id.* ¶¶ 73-74. The only thing holding ALDF and AE back is their fear that Peco and the Vaughts will use the Law against them. *Id.* ¶¶ 74-75.

As Defendants themselves concede, that "chilling effect" establishes Plaintiffs' standing, Peco Br. 9; but the Complaint is also replete with facts confirming Plaintiffs are right to be

chilled by these Defendants' ability to enforce the Law against them. The Law was sponsored by Defendant (Representative) DeAnn Vaught for her personal use as a farmer, Complaint ¶¶ 44 101; it was enacted after the construction of new Peco facilities in Arkansas just like those that have been subject to "activist employment" investigations in the past, *id.* ¶¶ 50, 56, 71; an agribusiness advocacy organization Defendants are aligned with recently declared factory farms and slaughterhouses *will* use these laws against Plaintiffs, *id.* ¶¶ 45-46, 51; Defendants then refused to waive their rights under the Law despite Plaintiffs' request, *id.* ¶¶ 47, 52; and they are refusing to do so even now as a litigation position, Peco Br. 14; Vaughts Br., Dkt. No. 25, at 8.

Defendants advance a cascade of arguments to fulfil the Law's objective of chilling speech while dodging judicial review, but each has been rejected by controlling authority. Peco claims the Law does not implicate First Amendment rights. But, for instance, it restricts information's "use," and the Supreme Court has held "restraints on the way in which the information might be used" interferes with the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (quotation marks omitted). Defendants claim Plaintiffs lack standing. But, "self-censorship" brought about by a defendant's ability to "enforce the statute" is a basis for standing—and, for the reasons stated above, a particularly strong one here. *281 Care Comm. v. Arneson*, 638 F.3d 621, 627-28 (8th Cir. 2011). In tension with their standing arguments, Defendants also assert they should be allowed to chill Plaintiffs' speech because the Constitution does "not directly apply" to their conduct. Peco Br. 16. But, when private parties are authorized to invoke a law that suppresses free speech the First Amendment applies. *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). Peco also insists Plaintiffs can only proceed if a separate statute provides this Court jurisdiction over Plaintiffs' constitutional challenge. But, this Court has inherent equitable power to entertain constitutional claims, *Corr. Servs. Corp. v. Malesko*,

534 U.S. 61, 74 (2001), and 28 U.S.C. § 1331 establishes federal question jurisdiction. Finally, Defendants assert that Plaintiffs could have standing and still not be able to articulate a "ripe" facial *or* as-applied claim. But, the Eight Circuit has rejected this illogical proposition. *281 Care Committee*, 638 F.3d at 631.

The Arkansas Ag-Gag Law, designed by DeAnn Vaught to grant her and Peco a weapon to squelch Plaintiffs' speech, has accomplished its goal, violating the First Amendment. Defendants' contention that Arkansas has discovered a never-before-heard-of end-run around the First Amendment to suppress speech should be rejected.

## I.      STANDARD OF REVIEW

In considering a motion under Rule 12(b)(6) for failure to plead a claim—which Defendants properly indicate applies to all of their arguments, Peco Br. 4; Vaughts Br. 3—the Court must "accept the allegations in [the] complaint as true and afford [the plaintiff] all reasonable inferences from those allegations." *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).

## II.     ARGUMENT

### A.  *Arkansas' Ag-Gag Law Unquestionably Infringes on First Amendment Rights.*

Peco's opening argument, mixing standing and the merits to contend the Arkansas Ag-Gag Law does not implicate "First Amendment right[s]," blinks reality. Peco Br. 7. Indeed, it is devoid (as it must be) of any reference to the Law's text, and pretends the Law operates in an entirely different manner than it does.

The Arkansas Ag-Gag Law creates a cause of action by an "owner or operator" against "[a] person who knowingly gains access to a nonpublic area of a commercial property and engages in an act that exceeds the person's authority to enter the nonpublic area." Ark. Code

§ 16-118-113(b). The only general exceptions are: (1) if the conduct is "protect[ed] … under state or federal" employment law, *id.* § 16-118-113(f)(1), or (2) the investigation is of "a state agency [or] a state-funded institution of higher education," *id.* § 16-118-113(g), so as to avoid the pre-enforcement challenge brought in North Carolina against UNC. Complaint ¶¶ 23-28.[1]

As relevant here, the Law defines "[a]n act that exceeds a person's authority to enter a nonpublic area" to include, but not be limited to, "an employee … for a reason other than a bona fide intent of seeking or holding employment or doing business" "knowingly" entering a nonpublic area and:

> (1) Captur[ing] or remov[ing] the employer's data, paper, records, or any other documents and us[ing] the information on or in the employer's data, paper, records, or any other documents in a manner that damages the employer;
> (2) Record[ing] images or sound occurring within an employer's commercial property and us[ing] the recording in a manner that damages the employer;
> (3) Plac[ing] on the commercial property an unattended camera or electronic surveillance device and us[ing] the unattended camera or electronic surveillance device to record images or data in a manner that damages the employer; … [and]
> (5) Commit[ting] an act that substantially interferes with the ownership or possession of the commercial property.

Ark. Code § 16-118-113(c). Plaintiffs do not challenge the Law's regulation under section (c)(4)—"conspir[ing] in an organized theft"—and they only challenge section (b) to the extent it covers activities equivalent to what is described in sections (c)(1)-(3) and (5) performed by a "person" who is not an "employee."

The challenged provisions are littered with restrictions on First Amendment freedoms. As explained above, (c)(1) and (2)'s restriction on the "use" of information is an attack on First Amendment rights. "An individual's right to speak is implicated when information he or she possesses is subjected to restraints on" its "disseminat[ion]." *Sorrell*, 564 U.S. at 568. This is

---

[1] The Law also excludes liability for investigations of healthcare or medical services providers, and investigations performed by law enforcement officers as part of their duties. Ark. Code § 16-118-113(g).

particularly true where, as here, the statute allows some "speakers [to] obtain and use the information" but not others, depending on how they use the information. *Id.* at 571.

Likewise, (c)(1) and (2)'s restrictions on "capturing" information to be "used" concern First Amendment activities because the First Amendment protects the "creation" of information to be communicated. *Id.* at 570; *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011). A statute can no more "dam the source" of speech than it can target speech itself. *Buehrle v. City of Key W.*, 813 F.3d 973, 977 (11th Cir. 2015); *see also W. Watersheds Project v. Michael,* 869 F.3d 1189, 1195-96 (10th Cir. 2017) (collecting cases establishing "collection of [] data" for speech is protected by First Amendment).

Moreover, the specific type of "capturing" information restricted by (c)(2) and (c)(3)—"recording"—is a recognized form of "speech," as recording "itself is an inherently expressive activity." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018); *see also Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1208 (D. Utah 2017) ("[I]t appears the consensus among courts is that the act of recording is protectable First Amendment speech."). Further, courts protect recording because recordings are needed to produce speech. *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("[T]he act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected[.]" (emphasis in original)); *see also Turner v. Lieutenant Driver,* 848 F.3d 678, 688-89 (5th Cir. 2017) ("[T]he Supreme Court has long recognized that the First Amendment protects film. A corollary to this principle is that the First Amendment protects the act of making film[.]").

Further, as explained above, the legislative record establishes the Law is aimed at stopping the development and release of information to reveal animal "'cruelty'" on "'farm[s],'" especially if that information is obtained through "'activist employment.'" Complaint ¶¶ 98, 102 (quoting floor statements and testimony in support of the Law). That is, its restrictions on speech are trained on groups like ALDF and AE, who engage in employment-based undercover investigations to produce their advocacy. *See, e.g.*, *id.* ¶¶ 56-59, 61-64. When a "law's purpose and justification" is to suppress speech, that alone is a basis to subject it to strict First Amendment scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).[2]

Peco insists the Arkansas Ag-Gag Law regulates "false pretenses" and "lying," Peco Br. 1, 3, 7, 10, when *nothing* in the statute requires that a person utter a false statement before their expressions can be penalized. In the case Peco relies on an element of the statute was a "False Claim[]," and the Supreme Court concluded that prohibition was unconstitutional. *United States v. Alvarez*, 567 U.S. 709, 715 (2012); *see also Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 909, 923 (S.D. Iowa 2018) (holding a law restricting "false statements or representation" to gain employment is unconstitutional under the First Amendment). The Arkansas Ag-Gag Law, in contrast, covers the most scrupulously honest employees who enter areas they do not need to for their job, see misconduct, and publically blow the whistle. Further, because subsection (b) extends the statute to any "person" who engages in similar conduct, and the statute's exceptions

---

[2] In light of the text and legislative history, subsection (c)(5)—restricting any activity "that substantially interferes with the ownership or possession," without defining those terms—must also be read to restrict the gathering of information to be used (speech) and/or information's use (speech). For instance, it should be understood to cover speech that reveals information the speaker observed in nonpublic areas that he or she did not "record[]," "capture[]," or "remove[]"—as required to fall within (c)(1)-(3). Further still, the statute also extends liability to "[a] person who knowingly directs or assists another person to violate this section." Ark. Code § 16-118-113(d). "Direct[ing]" someone necessarily involves speech. *See United States of Am. v. Sineneng-Smith*, 910 F.3d 461, 473 (9th Cir. 2018) (phrase "encourage or induce" must be read to include "speech").

only cover "protections provided to employees under state or federal law," the Law punishes a visitor on a tour who wanders off, sees criminal conduct, and reports it to *anyone*. No misstatement is required.

Peco also attempts to recast the Law as a "trespass, theft, agency, and breach of contract" statute, Peco Br. 7, which all separately exist under Arkansas law, *see* Complaint ¶ 99, and which Plaintiffs are *not* challenging.[3] However, Peco's authority explains traditional trespass laws and the like are "generally applicable laws." *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 521 (4th Cir. 1999). "Generally applicable laws" have "the same force" whether or not a person is engaged in First Amendment activities. *Id.* They are "not aimed at the exercise of speech or press rights." *Am. Civil Liberties Union of Illinois*, 679 F.3d at 601-02. Trespass, for instance, occurs when there is an unwanted entry, regardless of whether the objective of the entry was to engage in speech. Accordingly, the treatment of "general trespass statute[s]" is distinct from laws that "differentially treat[] [] individuals who create speech." *W. Watersheds Project*, 869 F.3d at 1197. While the state can pass a speed limit (a generally applicable law), it cannot pass a speed limit solely for people on the way to a political rally (a law selectively targeting First Amendment activities). Here, engaging in First Amendment protected activities (creating speech and communicating it) are required elements of violating the Arkansas Ag-Gag Law. The Law is not "generally applicable."

Moreover, even if the Court were to construe the Ag-Gag Law as "generally applicable," it would still require First Amendment scrutiny because its elements can be triggered by speech.

---

[3] That these other laws exist and Peco deems them equivalent indicates the Ag-Gag Law's function is to restrict speech and it is unconstitutional. *See, e.g.*, *Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (en banc) (striking down content-neutral law because "various other laws" would "achieve [the] stated interests while burdening little or no speech").

*Am. Civil Liberties Union of Illinois*, 679 F.3d at 602 ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010). Even if a statute is phrased so all its elements concern both "speech and nonspeech," to the extent the law's applications target speech it at least requires intermediate scrutiny. *United States v. O'Brien*, 391 U.S. 367, 376 (1968). The Arkansas Ag-Gag Law, however, explicitly restricts communicating information and gathering information to communicate. Its reach is defined by pure First Amendment activities.

### B. Plaintiffs Have Standing.

Defendants argue in the alternative that assuming the Law infringes on First Amendment freedoms (and it does), Plaintiffs lack standing to vindicate those rights. This argument cannot be reconciled with Defendants' admission that "self-censorship," such as Plaintiffs refraining from engaging in their investigations and advocacy because they fear Defendants will enforce the Law against them, establishes First Amendment standing. Vaughts Br. 4; *see also* Peco Br. 6. To avoid this conclusion, Defendants engraft requirements onto the doctrine—that the potential prosecution must be "imminent" and that the doctrine is limited when a statute provides for civil penalties. These additions are unsupported by law and irrelevant in light of the procedural posture of this case and facts alleged.

### i. Plaintiffs' Chill Provides Them Standing.

Defendants rightly concede that First Amendment standing to challenge a statute does not require a plaintiff to "have been actually prosecuted or threatened with prosecution." *281 Care Comm.*, 638 F.3d at 627. "Rather, the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the

statute." *Id.* That "[s]elf-censorship can itself constitute injury-in-fact." *Id.*; *see also*, *e.g.*, *Telescope Media Grp. v. Lindsey*, 271 F. Supp. 3d 1090, 1105 (D. Minn. 2017) (standing based on chill where plaintiffs "would operate in a way that violates" a law, but have refrained from doing so).

The "proper defendants" in those circumstances are those "whose role it is to administer and enforce the statute." *281 Care Comm.*, 638 F.3d at 631. The only limitation on this doctrine is the chill must be "reasonable," that is, not "imaginary or speculative." *Id.* at 627 (cleaned up).

Based on these principles, the Fourth Circuit held plaintiffs (including ALDF) who regularly engage in "activist employment" had First Amendment standing to seek prospective relief, to enjoin and declare unlawful owners and operators seeking civil penalties when plaintiffs carry out their desired investigations. *PETA*, 737 Fed. App'x 122. The Fourth Circuit explained plaintiffs' allegations—that they had previously "conducted actual undercover investigations in public and private facilities"; they were again "prepared to go forward but for their fear of liability under the Act"; the "Act appears by its terms to prohibit Plaintiffs' planned activities"; the challenged law "was specifically" designed to be used against them; and "Defendants are the officials who are empowered to initiate" suits under the Act and never "disavowed" that power—established plaintiffs were reasonably chilled by the defendants' ability to bring an action, an injury-in-fact. *Id.* at 130-31. Moreover, the Fourth Circuit continued, naming defendants who were "tasked with either initiating or requesting approval for a lawsuit under the Act" was proper because "an order preventing these Defendants from exercising their powers to initiate or bring a lawsuit under the Act would seem to be sufficient to quell Plaintiffs' fear of liability." *Id.* at 132.

While Peco casts *PETA* as "highly fact-specific," Br. 9-10, to the extent that is true, it is highly specific to the facts of *this case*. Again, Arkansas' Law is "modeled" after the North

Carolina statute at issue in *PETA*. Complaint ¶ 27; *compare* Ark. Code Ann. § 16-118-113, *with*

N.C. Gen. Stat. § 99A-2. Moreover, while Peco notes the defendants in *PETA* were UNC and its

attorney (the Attorney General), *see* Peco Br. 9, the *PETA* defendants, like Defendants here,

argued it was uncertain whether they would invoke the law because the statute was designed to

be used by the "owner or operator of any targeted facility," not the state, 737 Fed. App'x at 132.

The Fourth Circuit held this irrelevant, explaining the named defendants would be the people

who "chose to sue under the Act" if plaintiffs "carried out" their planned investigations of the

facilities, so plaintiffs could seek relief against them. *Id.*

The facts laid out in *281 Care Committee* and *PETA* that established standing are the

exact facts alleged here. ALDF and AE explain that they have collectively conducted hundreds

of undercover investigations—including of slaughterhouses and factory farms like

Defendants'—to gather information to use in their advocacy, in the *precise* manner prohibited by

Ark. Code § 16-118-113(c)(1)-(3), (5); Complaint ¶¶ 9, 56-59, 61-64, 73-75, 98.[4] They have

specific plans to investigate Defendants' facilities and have secured the services of an

investigator who is prepared to gather information for Plaintiffs' advocacy using the methods

---

[4] The Vaughts oddly suggest that because most of AE's prior investigations have occurred abroad they should be discounted. Vaughts Br. 7. However, that AE has gained access to more than 700 facilities across the globe, including those that had never before been successfully investigated, Complaint ¶ 62, certainly renders its claim that it "would like to engage" in activities that would violate the Arkansas Ag-Gag Law plausible. *281 Care Comm*, 638 F.3d at 627; *see also Reynolds*, 297 F. Supp. 3d at 915 n.7 (not necessary for standing for plaintiff to have previously conducted an investigation in the state). Moreover, since filing the Complaint in this case, AE has released the results of its first U.S.-based undercover investigation, an investigation of a dairy containing approximately the same number of animals as the Vaught's factory farm. https://animalequality.org/news/investigation-animal-equality-reveals-shocking-scenes-of-neglect-at-us-calf-ranch/. The Vaught's characterization of their factory farm as a "family farm," Vaughts Br. 8, does nothing to distinguish their facility from others. The "family farm" label is regularly incanted by agribusinesses like the ones Plaintiffs investigate to cover up their industrial nature. *See, e.g.*, http://www.themaschhoffs.com/our-family (website of facility investigated by ALDF).

regulated by the Arkansas Ag-Gag Law. *Id.* ¶¶ 65-75. The only reason ALDF and AE have not

carried out their desired investigations is they reasonably fear Defendants' ability to seek the

Law's penalties. *Id.* ¶¶ 73-75. Indeed, the Law was specifically designed to punish Plaintiffs'

work. *See, e.g.*, *id.* ¶¶ 98, 101-02 (quoting legislative statements and testimony).[5]

Defendants insist that because they have not expressly threatened Plaintiffs with

enforcement of the Law, Plaintiffs have no basis to fear Defendants will use the Law against

them. Vaughts Br. 7; Peco Br. 14. This is legally and factually incorrect. Standing based on chill

exists when there is the "specter" a law may be enforced because that alone can "effectively

drive certain ideas or viewpoints from the marketplace," undermining the First Amendment.

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994) (quotation marks omitted).

Requiring an explicit threat for standing would allow parties to perpetuate the "specter" by

simply refusing to declare their intentions. *See Six Star Holdings, LLC v. City of Milwaukee*, 821

F.3d 795, 803 (7th Cir. 2016) (rejecting argument plaintiff lacked standing because defendant

had "discretion" whether to enforce the law). Therefore, the Eighth Circuit has explained that

when, as here, a party "vigorously defend[s]" a statute and "has never suggested that it would

refrain from enforcement," courts will assume the party will enforce the law. *Krantz v. City of*

*Fort Smith*, 160 F.3d 1214, 1217 (8th Cir. 1998).

Moreover, Plaintiffs' allegations, which at this stage must be taken as true, establish

Defendants have taken numerous steps to enhance the specter that they will enforce the Law

against Plaintiffs. Before bringing suit, ALDF and AE asked Defendants to waive their rights to

---

[5] "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). However, as Plaintiffs allege, CBD and FCWA also have standing because they would "use information derived from" ALDF and AE's investigations in their advocacy. *Reynolds*, 297 F. Supp. 3d at 915; Complaint ¶¶ 82-86, 91-94.

use the Law against them because it is unconstitutional. Defendants declined to do so. Complaint ¶¶ 47, 52. They also refuse to do so now. Peco Br. 14; Vaughts Br. 8. Even when First Amendment rights are not at stake, an exchange of letters in which one party asserts a right that the other party rejects is sufficient to establish a concrete dispute between the parties. *Monsanto Co. v. Syngenta Crop Prot., Inc.*, 2008 WL 294291, at *3 (E.D. Mo. Jan. 31, 2008) ("'Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do.'" (quoting *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007)); *Highway Equip. Co. v. Cives Corp.*, 476 F. Supp. 2d 1079, 1086 (N.D. Iowa 2007).

Further, Plaintiffs explain the Ag-Gag Law was not only targeted at their conduct, but was designed specifically for *these Defendants* to use against Plaintiffs. DeAnn Vaught sponsored the legislation to, she explained, support her private business. Complaint ¶ 101. Moreover, the Law was passed on the heels of Peco building operations in Arkansas that have been subject to employment-based investigations in the past. *Id.* ¶¶ 50, 56, 71. Further, the Vaughts are members of the Farm Bureau that declares its membership wishes to use Ag-Gag statutes against Plaintiffs. *Id.* ¶¶ 45-46; *see also id.* ¶ 51 (explaining Peco works closely with related organizations).

As the Vaught's authority, *Zanders v. Swanson*, explains, the facts here easily distinguish this case from those in which standing has been denied, because here, unlike in those cases, the Law's text, legislative history, and the parties' course of conduct all independently establish Plaintiffs are "the target or object of the challenged statute's prohibitions." 573 F.3d 591, 594 (8th Cir. 2009). Standing based on chill exists whenever plaintiffs "reasonably" fear the

defendants will use the law against them. *281 Care Comm.*, 638 F.3d at 627. There are substantial reasons ALDF and AE fear these Defendants using the Law against them. Plaintiffs have standing.

ii.   *"Imminence" Is Not Required.*

Defendants carve up the steps in Plaintiffs' investigations and claim this makes Plaintiffs' injury "so speculative that it cannot be considered imminent." But, as Defendants go on to admit, the requirement of "imminence" is only present when a plaintiff's standing is based on the potential for "future" harm. Peco Br. 11-12; Vaughts Br. 6. A chill on speech, in contrast, is an *actual*, ongoing injury-in-fact; it is an "injury [that] has *already occurred*." *281 Care Committee*, 638 F.3d at 631 (emphasis added). Plaintiffs are not making a claim of future harm; they are suffering a harm right now because of the menace that Defendants will enforce the Law. *See also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("self-censorship" is a "harm"); *Mobil Oil Corp. v. Attorney General*, 940 F.2d 73, 76 (4th Cir. 1991) (chill causes people to "incur[] harm all the while"). Therefore "imminence" need not be shown.

Indeed, the case on which Defendants' arguments build, *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), underscores the distinction between claims of future harm and chill. *Clapper* states that where a challenged law "unquestionably regulat[es]," and thus chills the plaintiff's conduct, standing does not require the plaintiff to show a "potential" act will come to fruition and produce a harm, because the plaintiff is already experiencing an injury. *Id.* at 420. The *Clapper* plaintiffs could not claim standing based on chill because their activities did not fall within the statute they were challenging, which allowed for surveillance of foreigners when the plaintiffs were domestic individuals and entities. *Clapper*, 568 U.S. at 401, 420. Accordingly, they did *not* allege the challenged law led them to censor their communications;

they just stated they were engaging in the same speech in more "costly" manners—such as "travel[ing] so that they can have in-person conversations"—and feared their continuing communications would "in the future" "be intercepted" under the law. *Id.* at 415. Thus, *Clapper* states the plaintiffs' harm there was "very different" from First Amendment injuries based on the "chilling effect" of a law that "regulate[s], constrain[s], or compel[s] [] action" on the part of the plaintiff. *Id.* at 419.

Consistent with this, the Fourth Circuit has explained *Clapper*'s discussion of "standing [based] on prospective" injury and the requirement that injury be imminent are "inapposite" where a party has pleaded standing based on "chill[]." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 211 (4th Cir. 2017); *see also PETA*, 737 Fed. App'x at 131 ("Because Plaintiffs have sufficiently alleged an actual injury, we need not visit the district court's determination of whether *Clapper* would strip Plaintiffs of their standing to assert a claim of a threatened or imminent injury in the form of a civil lawsuit.").

Further still, even if Plaintiffs need to prove "imminence," both the Third and Fourth Circuits recognize whether an injury is "imminent" is an inquiry for summary judgment, not on a motion to dismiss. It is a "critical distinction" that *Clapper* invoked imminence when the plaintiff had to "identify a triable issue of material fact supported by an evidentiary record." *Schuchardt v. President of the United States*, 839 F.3d 336, 351 (3d Cir. 2016); *see also Wikimedia Found.,* 857 F.3d at 211-12. On a motion to dismiss, in contrast, a court must "afford [plaintiffs] all reasonable inferences from th[eir] allegations," *Blankenship*, 601 F.3d at 853, meaning the Court should assume that if plaintiffs have pleaded they reasonably fear the law's use against them that use is "imminent."

Moreover, based on Plaintiffs' allegation, no inference is needed; while they didn't need to, Plaintiffs have pleaded "imminent" liability. The Vaughts insist Plaintiffs may not be able to obtain employment that provides them access to Defendants' facilities and thus their injury is not "imminent." Vaughts Br. 6. But, gaining employment that allows them access, including to never-before-accessed facilities is exactly what Plaintiffs do. *See, e.g.*, Complaint ¶¶ 56, 62. Every court to have considered the question has concluded that ALDF's and similar organizations' prior investigations establish they will be able to conduct their desired investigations. *PETA*, 737 Fed. App'x at 130; *Reynolds*, 297 F. Supp. 3d at 914-15; *Herbert*, 263 F. Supp. 3d at 1200.

Defendants also contend Plaintiffs are uncertain whether they will uncover animal cruelty so Plaintiffs violating the statute is not "imminent." Peco Br. 12; Vaughts Br. 10. But Plaintiffs' investigations of equivalent facilities have uncovered exactly that, Complaint ¶¶ 56-57, and Plaintiffs possess information indicating Defendants' facilities engage in such misconduct, facts the Defendants do not dispute, Complaint ¶ 68, 71. More importantly, Plaintiffs target these facilities because—in addition to expecting they will be engaged in animal cruelty—features innate to their operations will reveal valuable information on other matters of public concern, particularly the treatment of agricultural workers and the environmental effects of such facilities. Complaint ¶¶ 16, 67-69, 70-72. An investigation of these facilities will provide valuable information for Plaintiffs' advocacy no matter what.

Finally, Defendants state Plaintiffs cannot be sure Defendants will be damaged by their release of information and choose to sue. Peco Br. 12; Vaughts Br. 10. However, with prospective challenges there is always uncertainty about whether the defendant will invoke a statute—criminal prosecutors, too, possess discretion. Plaintiffs need not wait to see if

17

defendants will use a law. *Six Star Holdings*, 821 F.3d at 803; *see also PETA*, 737 Fed. App'x at 129 (rejecting fact that "Defendants might choose not to bring a lawsuit under the Act" as a basis to deny standing). This should be particularly true here given the substantial basis for Plaintiffs' chill. Moreover, the Law does not require proof of specific damages. "[W]here compensatory damages cannot be quantified," the Law provides for damages based on the time a person spends investigating, not the consequences of the investigation. Ark. Code § 16-118-113(e)(4). Particularly as Plaintiffs' entire objective is to release the information they uncover to change how the public views industrial animal agriculture, *see, e.g.*, Complaint ¶¶ 59, 61, 64, 82-83, 91, the Law's liquidated damages provision guarantees Plaintiffs' investigation will produce a claim. In other words, were Plaintiffs to take any further steps, they would expose themselves to liability.

In sum, while Plaintiffs do not need to show an imminent risk of harm, because they are already suffering an actual injury, the Complaint well exceeds what would be required to establish "imminence," particularly in light of the deferential standard of review on a motion to dismiss.

### iii.   Plaintiffs' Chill Does Not Disappear Because They Face Civil Penalties.

Numerous courts, including the Eighth Circuit, recognize civil penalties like those under the Ag-Gag Law can produce a chill that establishes standing. *Balogh v. Lombardi*, 816 F.3d 536, 540, 542 (8th Cir. 2016); *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000); *Mobil Oil*, 940 F.2d at 76; *Athens Lumber Co., Inc. v. Fed. Election Comm'n*, 689 F.2d 1006, 1012 (11th Cir. 1982), *standing analysis adopted en banc*, 718 F.2d 363 (11th Cir. 1983).

Nonetheless, Defendants cite *Eckles v. City of Corydon*, 341 F.3d 762 (8th Cir. 2003), and *St. Paul Area Chamber of Commerce*, 439 F.3d at 487 n.4, which cites to *Eckles*, claiming

civil penalties are unlikely to produce chill. Those cases say no such thing. Rather they explain that where there is a civil remedy, the government cannot be made a defendant unless it "possesse[s] the authority to enforce" that remedy, as only the authority to bring a suit can create chill. *Eckles*, 341 F.3d at 769; *see also St. Paul Area Chamber of Commerce*, 439 F.3d at 487 n.4 (key issue for chill is whether plaintiffs "have brought suit against those with authority to enforce" the law). As Peco admits, *Digital Recognition Network, Inc. v. Hutchinson,* 803 F.3d 952, 957-58 (8th Cir. 2015), states the same. Peco Br. 13.

Defendants' cases thus confirm why Plaintiffs must be allowed to proceed. Plaintiffs cannot name state-defendants, as the state has no right to enforce the Law. If Plaintiffs cannot vindicate their constitutional rights against these Defendants, the First Amendment would be nullified through a statute chilling speech by providing for private enforcement. *See also* § II(C), *infra*.

      *iv.   This Case Can Redress Plaintiffs' Injury.*

The Vaughts also state that even if Plaintiffs prevail their injury will not be redressed because state courts might not agree with this Court's analysis of the Law. Vaught Br. 11. That is irrelevant. Plaintiffs request an injunction against these Defendants using the Ag-Gag Law to prosecute them for their desired investigations. Should Plaintiffs prevail, Defendants will be enjoined from initiating the suit. That will certainly relieve the chill that is keeping Plaintiffs from their desired investigations of Defendants' facilities. *PETA*, 737 Fed. App'x at 132.

Moreover, the Declaratory Judgment Act recognizes that where there is a live controversy, a declaration of rights can provide relief. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 & n.7 (2007). This is certainly true where the injury is one of self-censorship and chill. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (In a First Amendment case, "a

district court can generally protect that interests of a federal plaintiff by entering a declaratory judgment[.]"); *Steffel*, 415 U.S. at 469 ("Of course, a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear." (quotation marks omitted)).

### C. That Arkansas Deputized Private Parties To Enforce the Law Does Not Insulate the Statute From Constitutional Review.

Defendants further argue that they can perpetuate the "specter" of the Law's enforcement and Plaintiffs' self-censorship with impunity, because the First Amendment does not operate as a limitation on Defendants' conduct. Peco Br. 16; *see also* Vaughts Br. 12. In other words, they claim they can wield unconstitutional, state-granted authority to chill Plaintiffs' speech—such as by refusing to say whether or not they will enforce the Law against Plaintiffs, Complaint ¶ 47— and Plaintiffs are without redress. The First Amendment cannot be so easily undercut.

A statute creating a cause of action is a form of state action, and whoever produces a chill under that law can be held to account for violating the First Amendment. *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 880 (9th Cir. 1987) ("State laws whether statutory or common law, including tort rules, constitute state action."). As the Supreme Court explained, "The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). That is, by leaning on the Ag-Gag Law to cause Plaintiffs to self-censor, Defendants are exercising "state power"—the threat created by the cause of action granted to them by the state—and the First Amendment's limitations apply. *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1239 (D.N.M. 2017) ("state action exists … if right arises from a state statute").

Accordingly, the Eighth Circuit proceeded with a declaratory judgment action initiated by one private party asking the court to make clear it could not be sued by another private party because invoking the law would violate the First Amendment. A "fantasy baseball products" company asked the court to hold that Major League Baseball's use of "the right-of-publicity action that Missouri law provides" against it would violate the First Amendment. *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 820, 823 (8th Cir. 2007). The court did so. *Id.* at 824.

The Eighth Circuit has also stated that the "threat that private parties will enforce" a law establishes First Amendment standing. *Balogh*, 816 F.3d at 542 (quoting *Digital Recognition Network*, 803 F.3d at 957). "[R]egardless of whether the power to initiate an enforcement action lies with the state authorities or private parties," potential enforcement of the law can generate a First Amendment harm (self-censorship). *Fort Des Moines Church of Christ v. Jackson*, 215 F. Supp. 3d 776, 786 (S.D. Iowa 2016). That the Eighth Circuit concluded a statute's potential use by a private party generates a First Amendment injury means the First Amendment must apply. It also confirms why the First Amendment should restrict that potential use.

Defendants ignore the state's role in authorizing them to violate the First Amendment and instead insist that they themselves are not the state. Peco. Br. 16; Vaughts Br. 12.[6] However, that is not the relevant question. As the above case law establishes, the state's creation of the cause of action that has produced First Amendment harm through Defendants' potential to enforce the Law is sufficient "state action" to make the First Amendment apply.[7]

---

[6] The Vaughts are correct that DeAnn Vaught is being sued in her private capacity as a factory farm owner, not as a member of the legislature. Vaughts Br. 12.

[7] Defendants' cases—the majority of which either don't involve First Amendment claims or pre-date the Supreme Court's holding that chill establishes a First Amendment injury—do nothing to dispute this conclusion. *See, e.g.*, *George v. Pac.-CSC Work Furlough*, 91 F.3d 1227, 1231 (9th

The Vaughts also make the convoluted argument that because a law restricting First Amendment speech must be shown to serve a governmental interest and be properly tailored, Plaintiffs can only sue state officials, even though state officials (purposefully) have no role in enforcing the Law and thus cannot be named as Defendants. Vaughts Br. 11. While the Vaughts are correct that there must be evidence establishing the legislature "seriously undertook to address" a real societal "problem with less intrusive tools" before it chose to restrict speech, that evidence must appear in the legislative record. *McCullen v. Coakley*, 573 U.S. 464, 494-95 (2014); *see also id.* at 470-71 (relying on legislative history). "Post-hoc rationalizations," like the ones the Vaughts envision Arkansas creating to defend the Ag-Gag Law, "aren't the stuff" that prove a law's restrictions are necessary or tailored. *Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) (Gorsuch, J.) (cleaned up). Therefore, the state's participation in this matter is not required. Indeed, Plaintiffs have already produced the legislative record for the Law, and it is devoid of any evidence suggesting the restrictions on speech were needed, except to suppress Plaintiffs' advocacy. *See, e.g.*, Complaint Ex. A. Moreover, Plaintiffs have placed the Attorney General on notice of this suit, allowing her to intervene should the state believe it has relevant evidence to offer. Dkt. No. 11.

Were Defendants correct, lobbyist for any industry could use state laws to "suppress unpopular ideas or information or manipulate the public debate" by simply convincing the legislature to turn over enforcement of a statute targeting disfavored speech to private citizens. *Turner Broad. Sys., Inc.*, 512 U.S at 641. Thankfully, controlling precedent prevents this. By granting private parties the potential to infringe on First Amendment freedoms, the chill those private parties create with that cause of action brings about a live constitutional challenge.

---

Cir. 1996) (plaintiff's termination where there is "no County or state regulation of [] employment termination or disciplinary processes" did not implicate First Amendment).

### D.  This Court Has Jurisdiction To Hear Constitutional Claims.

Peco yet further claims this case is outside the Court's reach because Defendants are not government officials subject to 42 U.S.C. § 1983 and no other statute provides Plaintiffs access to the courts. Peco Br. 15. However, no statute is required. "[I]t is established practice for th[e] Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 & n.4 (1946) (citing additional cases); *see also Davis v. Passman*, 442 U.S. 228, 242 (1979) ("[W]e presume that justiciable constitutional rights are to be enforced through the courts," otherwise those rights would "become merely precatory."); Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative Constitutional Adjudication In Federal Courts*, 84 N.Y.U. L. Rev. 681 (recognizing *Ex parte Young*, 209 U.S. 123, 144 (1908), *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), and *Bolling v. Sharpe*, 347 U.S. 497 (1954), as prominent examples of cases proceeding directly under the Constitution). Indeed, even when sovereign immunity has led the Court to declare there is no cause of action for damages, it has instructed plaintiffs to invoke the courts' equitable powers to cure any ongoing harm, as "injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001).

Moreover, were this Court to require a statutory basis to hear this claim, 28 U.S.C. § 1331 provides "a very familiar [statute] grant[ing] jurisdiction to the federal courts over 'all civil actions arising under the Constitution, laws, or treaties of the United States.'" *Whitman v. Dep't of Transportation*, 547 U.S. 512, 513-14 (2006) (quoting 28 U.S.C. § 1331). In light of § 1331's broad grant of federal question jurisdiction, the Court need not determined whether *another* law like § 1983 "confers jurisdiction." *Id.* Instead, the only issue is whether a law

"removes the jurisdiction given to federal courts" already, which none does for claims under the Constitution. *Id.*; *see also Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 642, (2002) (holding a constitutional challenge "'presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve'" (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)).

Peco's authority supports Plaintiffs' position. *Alexander v. Sandoval* concerns a statutory, not constitutional claim, where the Court concluded the "[s]tatutory intent" was *not* to create a private right of action. 532 U.S. 275, 286 (2001). In other words, the presumption of jurisdiction created by 28 U.S.C. § 1331 was reversed by evidence that does not and cannot exist here.

Two of Peco's other cases concern requests for damages, and "[t]he Constitution does not directly provide for damages" or attorneys' fees. *Sanders v. Prentice-Hall Corp.*, 178 F.3d 1296, at *1 (6th Cir. 1999) (unpublished) (seeking wages "for work performed, and other damages"); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 918 (9th Cir. 2001) (seeking damages for past Fourth Amendment violations). Therefore, plaintiffs seeking those remedies require a separate statutory basis, such as 42 U.S.C. § 1983. Plaintiffs do not request such relief here.[8]

As a result, Peco's further claim that Plaintiffs cannot invoke the Declaratory Judgment Act, 28 U.S.C. § 2201, because they have no "cause of action" is a nonstarter. Peco Br. 15. In fact, Peco's cited cases underscore the misdirection on which this entire theory relies. Both

---

[8] Peco's only broader authority is *Fredin v. Olson*, where the report and recommendation stated it would construe a pro se prisoner petition under § 1983 so it could analyze and dismiss the claims. 2018 WL 6606249, at *1 (D. Minn. Oct. 29, 2018). In support of that nonbinding decision, *Fredin* relies on twenty-seven-year-old Ninth Circuit authority that concerned a takings suit for damages and concluded no prospective relief could be warranted under its facts. *Id.* (citing *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704 (9th Cir. 1992), which amended, 948 F.2d 57).

decisions concern requests that the court declare rights under a statute, where Congress purposefully chose *not* to create a cause of action. *Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, 2018 WL 2422314, at *3 (E.D. Ark. May 29, 2018); *Jones v. Hobbs*, 745 F. Supp. 2d 886, 890 (E.D. Ark. 2010). Here, Plaintiffs seek to determine and protect *constitutional* rights. Congress cannot limit such proceedings, otherwise the Constitution would lose its meaning, *see Davis*, 442 U.S. at 242, and Congress has provided a statutory basis for the courts to hear such claims, 28 U.S.C. § 1331.

### E.  Plaintiffs Can Raise Their As-Applied and Facial Challenges.

Finally, casting about for some anchor for its desired outcome, Peco incorrectly claims Plaintiffs cannot bring a facial *or* as-applied challenge. Re-packaging its argument that Plaintiffs must be sued before they can protect their rights, Peco states Plaintiffs' claims are not "ripe" because Plaintiffs have not yet carried out their investigations exposing themselves to liability. Peco Br. 18. Unsurprisingly, given that chill produces an ongoing injury-in-fact, *see* § II(B), *supra*, the courts explain that if plaintiffs can establish they are being chilled, their First Amendment claims are ripe. *281 Care Committee*, 638 F.3d at 631.

Peco also insists that if it can dream up some scenario in which the Ag-Gag Law would be constitutional, Plaintiffs' facial challenges fail. Peco Br. 17. This is not how the First Amendment works. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (in the First Amendment context "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition"). Indeed, the Supreme Court has expressly rejected the so-called "no set of circumstances" test for First Amendment claims. For facial overbreadth challenges, which Plaintiffs allege (Complaint ¶¶ 132-38), the Court explained that "[i]n the First Amendment

context" if plaintiffs establish "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" then the "law may be invalidated." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks omitted). Likewise, for facial First Amendment challenges claiming a law fails strict or intermediate scrutiny, which Plaintiffs allege (Complaint ¶¶ 132, 139-48), the Court recently emphasized if a law is content-based or viewpoint discriminatory it is "presumptively unconstitutional" unless the record proves otherwise. *Reed*, 135 S. Ct. at 2226. Moreover, even under intermediate scrutiny, the legislative record must justify the law, or it fails. *McCullen*, 573 U.S. at 494. Once the First Amendment applies, the question is not whether there is any situation in which the law can be used, but whether it can be justified. *Citizens United*, 558 U.S. at 331 ("facial" or "as-applied" speaks to "the breadth of the remedy" not the nature of the plaintiff's burden). Plaintiffs allege there is no justification for the Arkansas Ag-Gag Law. *See, e.g.*, Complaint ¶ 148.

### III.    **Conclusion**.

For the foregoing reasons, this Court can and should hear Plaintiffs' First Amendment challenge. Therefore, Defendants' Motions to Dismiss should be denied.


August 5, 2019                                  Respectfully submitted,

                                                /s/ David S Muraskin
                                                David S. Muraskin*
                                                Public Justice, P.C.
                                                1620 L. St, NW, Suite 630
                                                Washington, DC 20036
                                                (202) 861-5245
                                                dmuraskin@publicjustice.net
                                                Counsel for Plaintiffs

J.D. Hays
Arkansas Bar No. 2011043
4101 W Huntington Dr. #3103
J.D. Hays Law, PLLC
Rogers, Arkansas 72758
(870) 403-2395
jd@jdhayslaw.com
Counsel for Plaintiffs

Matthew Liebman*
Cristina Stella*
Kelsey Eberly*
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533
mliebman@aldf.org
cstella@aldf.org
keberly@aldf.org
Counsel for Animal Legal Defense Fund

Matthew Strugar*
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
matthew@matthewstrugar.com
Counsel for Animal Legal Defense Fund
Alan Chen*
Justin Marceau*
Of Counsel, Animal Legal Defense Fund
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6283
(303) 871-6449
achen@law.du.edu
jmarceau@law.du.edu
Counsel for Animal Legal Defense Fund

Sarah Hanneken
Oregon Bar No. 165104
Animal Equality
8581 Santa Monica Blvd. Ste. 350,
Los Angeles, CA, 90069
(414) 405-0538
sarahh@animalequality.org
Counsel for Animal Equality

Hannah Connor*
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
(202) 681-1676
HConnor@biologicaldiversity.org
Counsel for Center for Biological Diversity

*Admission Pro Hac Vice

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of August 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to counsel for all parties.

 /s/ *David S. Muraskin*

_____
David S. Muraskin*
Public Justice, P.C.
1620 L. St, NW, Suite 630
Washington, DC 20036
(202) 861-5245
dmuraskin@publicjustice.net